**UNITED STATES of America**

v.

**Nicola MELILLO, a/k/a Nickey Nelson, Defendant.**

**No. 66 Cr. 382.**

United States District Court,
S. D. New York.

April 23, 1971.

Whitney North Seymour, Jr., U. S. Atty., by James Schreiber, Asst. U. S. Atty., New York City, for plaintiff.

Irving Anolik, New York City, for defendant.

MOTLEY, District Judge.

Defendant has moved for an order vacating two judgments of conviction entered against him on his pleas of guilty and for an order directing new trials. 28 U.S.C. § 2255. The motion is denied without a hearing. Defendant has also moved for reconsideration of his motion for reduction of sentence. Rule 35, Fed. R.Cr.P. That motion is also denied.

Defendant was convicted upon his pleas of guilty to two separate charges. He received a five-year sentence and a $2,000 fine on the first charge. He received a consecutive five-year sentence and a $10,000 fine on the second charge.

The first indictment, 66 Cr. 382, charged defendant in one count with having committed perjury before a special United States Grand Jury impaneled in this District to investigate possible violations of criminal statutes, including the Hobbs Anti-Racketeering Act, false statements to agents of the Federal Government, and the Federal conspiracy laws.

Defendant was brought to trial on the first indictment on March 9, 1970. After the Government had completed its case and had rested, and after defendant had commenced his defense, defendant offered to plead guilty to the perjury charge on March 11, 1970. The court's voir dire of defendant before accepting this plea is set forth in Appendix A to this opinion. A pre-sentence report was ordered. The day of sentence was set for April 24, 1970.

In addition to the perjury charge, defendant had also been charged in a separate indictment, 67 Cr. 208, with three violations of the Hobbs Anti-Racketeering Act, 18 U.S.C. § 1951, in respect to the Round-A-Bout Club. This indictment involved two co-defendants. Following his plea of guilty on the perjury count, defendant offered to plead guilty

to a superseding information, 70 Cr. 174, which charged him with conspiracy to violate the Hobbs Act with relation to the Round-A-Bout Club in violation of the federal conspiracy statute, 18 U.S.C. § 371. The court's voir dire of defendant before accepting this plea of guilty is set forth in Appendix B to this opinion. The same day of sentence was set for this conviction which had been set for defendant's conviction on the perjury charge.

There was a crucial difference between the indictment, 67 Cr. 208, and the superseding information, 70 Cr. 174. Each count of the indictment charged defendant with a violation of Title 18 U.S.C. § 1951. If convicted upon each charge, defendant faced a possible prison term of 20 years and/or a $10,000 fine on each count, that is to say, a total of 60 years and/or $30,000 in fines. 18 U.S.C. § 1951. By pleading guilty to the one count conspiracy information under 18 U.S.C. § 371, defendant faced a maximum possible prison term of 5 years and a $10,000 fine.

As indicated above, on the day of sentence, defendant was sentenced to a five-year prison term with respect to each charge, the sentences to run consecutively. After the sentence was imposed, defendant's lawyer asked the court to consider making the sentences concurrent rather than consecutive. This court refused to do so and gave the reason therefor:

"The court has taken into consideration the testimony given by witnesses on the perjury trial which shed light on the facts in the second case involving a conspiracy to extort which indicated that in that case violence had not only been threatened but that violence had actually been used."

"For that reason the court is making the sentences consecutive." (Tr. of Sentence Proceedings, 4/24/70, p. 9).

The evidence on the perjury trial disclosed that a waitress working in the Round-A-Bout Club had been tripped and made to fall down a flight of stairs. (Tr. of Trial, 3/10/70, pp. 194–195). The court also had reviewed the grand jury testimony of the owner of the Round-A-Bout Club, who testified upon the perjury trial, to determine which parts of that testimony were properly made available to defense counsel after that witness testified (Tr. of Trial, 3/10/70 pp. 211–218). Those minutes revealed that the manager of the club had been physically attacked. (Minutes of 2/9/66, p. EJC–8). The grand jury testimony, of course, revealed throughout that the owner of the club had been repeatedly threatened with physical violence to himself and his family. The testimony on the perjury trial also disclosed that the young owner of the club was forced to close the club after it had been in operation only a few months (Tr. of Trial, 3/10/70, pp. 197, 231). This violence and intimidation were resorted to because the owner of the Round-A-Bout Club had refused to go along with the extortion plot against him.

One of the other two defendants in the Hobbs Act indictment, 67 Cr. 208, James DeMasi, went to trial on that indictment before another judge of this Court, Murphy, J., and was convicted on all three counts. He was sentenced on December 1, 1970 by Judge Murphy to 10 years on each count concurrently. Another defendant known only as Matty "John Doe", fitting a certain physical description, has never been identified, located or apprehended.

In connection with defendant's motion to reconsider his motion for reduction of sentence, the court has reviewed relevant testimony on the DeMasi trial which confirmed the actual use of violence against persons associated with the Round-A-Bout Club. (Tr. of DeMasi Trial, e. g., pp. 159–160, 259–263, 286–291). The evidence on both trials established Matty as the actual perpetrator of the violence. It also established the instant defendant as a more significant figure in the scheme to extort than DeMasi.

Defendant apparently suspected that an admission on his part that he had any

connection with the violence which actually took place at the Round-A-Bout Club would result in a severe penalty. Consequently, upon his voir dire on his plea of guilty, he was very evasive on the issue, as the transcript shows. (Appendix B, p. 10). The information had charged that it was a part of the conspiracy that the defendant and his co-defendants (DeMasi and John Doe) would resort to extortion and the use of threats of physical violence to persons and property at the premises. Defendant, at first, evaded an admission that he conspired to use threats of physical violence. When the court indicated it would not accept the plea unless there was a factual basis for same as to this element of the charge, Rule 11, Fed.R.Cr. P., defendant, finally, admitted that he had agreed with one Aiello that threats of physical violence would be used. (Appendix B, p. 10).

■ In determining the severity of the sentence to be imposed in any criminal case, the court may consider any relevant information bearing on that question. United States v. Malcolm, 432 F.2d 809 (2d Cir., 1970) In imposing sentence the court, therefore, took into consideration trial testimony and other competent information before it (grand jury minutes) which showed that defendant's agreement to use threats of physical violence had actually led to use of wanton violence against innocent persons. The penalty as to each charge was within the statutory limits.

After his sentence on April 24, 1970, defendant filed, on July 8, 1970, a motion to reduce the sentence on the following grounds: 1) sentence was excessive in view of the nature of the crimes charged and the defendant's background; 2) the fact that the defendant pleaded guilty to both charges should have been received in mitigation; 3) the pre-sentence report contained irrelevant and prejudicial material which may have misled the court in imposing sentence; 4) the sentence was unwarranted under any generally accepted theory of punishment.

■ (1) The crimes with which defendant was charged, perjury and conspiracy to violate the Hobbs Act, are serious, reprehensible acts. The court did not have before it a young immature adult involved in the commission of his first crime. The Government noted with respect to defendant's claim that the penalty was excessive in view of the fact that he had no prior record, that in a similar case, United States v. Vincent John Rao, 65 Cr. 232, another judge of this Court, the late William B. Herlands, sentenced Rao to 5 years imprisonment and a $2,000 fine on conviction of perjury, although he, too, had never been convicted and was, at the time, 71 years of age. Rao's conviction was affirmed by the Court of Appeals, United States v. Rao, 394 F.2d 354 (2d Cir.) cert. den. 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). It should be noted also that in United States v. Vincent Alo, aff'd 439 F.2d 751 (2d Cir. 1971), this court sentenced Alo to five years, concurrently, on each of two counts upon which he had been convicted, after trial by jury, on charges of giving false and evasive answers to questions put to him by the Securities and Exchange Commission in violation of 18 U.S.C. § 1505. He, too, had no prior criminal conviction and was at the time more than 50 years old. Imposition of the maximum sentence and fine on first offenders for perjury is, therefore, not unusual in this Court. There was no violence involved in either the Rao or Alo cases. There is, therefore, no basis for the claim that leniency should have been extended to this defendant in view of the nature of the crimes and the defendant's background.

■ (2) Defendant claimed that his guilty plea should have been received in mitigation of sentence, since it evidenced a repentant attitude and saved the Government time and expenses. The Government replied, and the court agrees, that there is another equally satisfactory explanation for defendant's plea. The testimony upon the perjury case makes clear that it is reasonable to infer that

the defendant was aware of a high probability that he would have been convicted on that charge. Then, on the advice of experienced and competent counsel, defendant sought to dispose of both the perjury charge and the outstanding Hobbs Act indictment which carried a possible maximum penalty of 20 years on each count, if convicted, in the hope of lowering his exposure to a long prison term. The decision to plead guilty to a superseding information which carried a possible maximum penalty of 5 years imprisonment is, therefore, not necessarily evidence of a repentent attitude. Defendant did not plead guilty to either charge until after the Government had presented its entire case on the perjury charge and defendant had commenced his defense. By then the Government had already spent considerable time and money. During the course of that trial, fragments of the evidence regarding the outstanding Hobbs Act indictment were adduced. It was then that defendant reassessed his position with respect to both indictments and offered to plead guilty to the perjury indictment and the superseding information.

■ (3) Before making the motion for reduction of sentence, defendant's counsel requested permission to see the presentence report. He did not ask to see the pre-sentence report before the court imposed sentence. The request was granted. Townsend v. Burke, 334 U.S. 736, 740–741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); United States v. Malcolm, *supra.* The pre-sentence report made reference to the fact that the defendant's father was, prior to 1958, associated with Vincent Squillante in the New York Carting Association. The pre-sentence report then stated: "This organization came to an end when Squillante, the godson of Albert Anastasia, disappeared. Squillante is believed to have been murdered." In opposing the motion to reduce the sentence on this ground, the Government attached to its papers the affidavit of the probation officer who wrote the report. It pointed out that the information regarding the defend-

ant's father came directly from the defendant during an interview with him on March 11, 1970 when he was asked, as all defendants are, about his father's background and work. Rule 32(c) (2), Fed.R.Cr.P. The defendant also advised the probation officer that he and his father, after the disappearance of Squillante, organized the Queens Trade Waste Association from which each received a salary, plus expenses and a car. Defendant was so employed at time of sentence. He also owned and operated garbage collection trucks. In addition, the defendant's sister, Mrs. Vivian Magliano, is employed by the Association. At the time defendant committed perjury, the grand jury was investigating charges of extortion in the private garbage collection business in the metropolitan area and defendant was a target of the investigation (Tr. of Trial, 3/9/70, p. 66). Even if defendant had not volunteered the information about his father and his own employment, such background information was clearly relevant at time of sentence. Rule 32(c) (2), Fed.R.Cr.P. Defendant did not deny the truth of the statements regarding his father's associations, he merely claimed they were inflammatory. But, as the court has pointed out, the severity of the sentence here was the result of evidence of actual violence, not references to the defendant's father's associates in the pre-sentence report.

■ (4) In reply to defendant's claim that the sentence is unwarranted under generally accepted theories of punishment, the Government argued in its opposing papers that defendant is not likely to be rehabilitated. He was at the time 50 years old. The seriousness of the crimes, perjury and conspiracy to extort, militated in favor of a heavy penalty. And the vicious nature of the extortion charge was such that the public was entitled to be protected from this defendant.

Finally, with respect to defendant's contention that both charges arose out of a single set of circumstances and, therefore, in fairness should have been con-

current, the Government pointed out that it was not absolutely clear that only one set of circumstances was involved. The Government noted that the perjury was committed before a grand jury investigating not only the Round-A-Bout Club extortion plot but extortion and restrictive practices in the garbage industry in the metropolitan area. This defendant, by his own admission, as indicated in the pre-sentence report, was a controlling figure in this industry. He was the subject of an investigation which lasted some 18 months. The motion for reduction of sentence was, accordingly, denied.

Defendant has now moved for a reconsideration of this court's order denying the motion for reduction of sentence on the grounds previously urged regarding the pre-sentence report and on the ground that the defendant has become ill since he went to prison. The ground of illness was also previously raised by defendant's attorney in a supplemental affidavit filed after the court had ruled on the first motion to reduce the sentence. Defendant has furnished the court with medical records in connection with his motion for reconsideration. The court has reviewed those records and again denies defendant's motion for reduction of sentence. The medical records disclose that defendant was discharged from the prison hospital in September, 1970 in satisfactory condition.

Upon his motion under 28 U.S.C. § 2255 defendant claims that his plea of guilty was induced by an assurance given to him by his attorney, and "confirmed" to him by the United States Attorney, that he would receive a maximum sentence of 1 and ½ years on each count concurrently. Exactly what his attorney said to him or what caused him to rely upon the attorney's alleged statement is not specifically set forth. What is meant by the allegation that the attorney's statement was "confirmed" to him by the United States Attorney is nowhere explained. (See defendant's affidavit attached to his moving papers.)

In addition to his own affidavit, defendant has furnished the affidavit of his mother, Mrs. Joseph Melillo, and sister, Mrs. Vivian Magliano, and three other persons. One of these persons, David Gebeloff, alleges that he was present in court just prior to defendant's offering to plead guilty. Who Mr. Gebeloff is and his connection with defendant is not shown. Mr. Gebeloff alleges he was sitting next to defendant's mother and sister and overheard defendant's mother in conversation with one of defendant's attorneys. He alleges that he heard Mrs. Melillo ask the attorney, Mr. Marvin B. Segal, "Why he didn't fight for her son 'because he is not guilty.'". Mr. Gebeloff alleges the lawyer replied: "It's better this way. He won't get more than 18 months. Why gamble?" Mr. Gebeloff further alleges that when he left the courtroom he heard Mrs. Melillo ask an Assistant United States Attorney, Mr. Andrew Maloney, "What did you do to my son. You have the wrong man." He then alleges that Mr. Maloney replied in substance: "It's better this way, Mom, he won't get more than 18 months." There is no allegation that defendant was present during these alleged conversations or that affiant discussed the matter with defendant.

Another unidentified affiant, Leonard Romolgia, says that he, too, was present in court shortly before defendant entered his pleas of guilty. At this time he met defendant with his attorneys, Mr. Marvin B. Segal and Mr. Nicholas Scoppetta. He heard these attorneys discussing a plea of guilty with defendant. He alleges further that he heard them say that Mr. Maloney, the Assistant United States Attorney in charge of the case, "would drop one of the charges if the plea of guilty were taken." There is no reference to 18 months in that affidavit.

The third affiant, Joseph Pocchiaria, alleges as follows: "The morning Mr. Melillo plead guilty I was in the United States Courthouse. I saw his attorney Mr. Marvin Segal whom I had met before and when I asked him why Mr. Melillo plead guilty, Mr. Segal said that he would only get 18 months." Again, there is no allegation that defendant was present or

that affiant discussed the issue with defendant at that time.

The affidavits of defendant's mother and sister both allege that Mr. Segal stated to the mother that her son would get only 18 months. There is no allegation in either affidavit that prior to the defendant's pleas of guilty he discussed with either of these affiants his beliefs or state of mind regarding possible sentence.

With its papers in opposition to defendant's motion under 28 U.S.C. § 2255, the Government has furnished the affidavit of Assistant United States Attorney Andrew Maloney, Nicholas Scoppetta (defendant's trial counsel and counsel at the time he entered both pleas), and Marvin B. Segal, an associate of Mr. Scoppetta who allegedly made the statement to defendant's mother which was overheard by defendant's sister and one other affiant. Each affidavit sets forth a clear, categorical, unequivocal denial that the affiant represented or told defendant that he would receive an 18 month sentence on his plea of guilty.

In connection with this claim it should be noted first that defendant in his moving papers states the following: "It is not alleged that the court itself made any promise." The basis of defendant's reliance on his lawyer's alleged statement, "confirmed" to him by the United States Attorney is, therefore, a mystery.

The Second Circuit has had a very recent occasion in United States v. Malcolm, *supra,* to review the law applicable to a claim that a plea of guilty was induced by a promise with respect to the sentence which might be imposed. As the court there pointed out, "A guilty plea if induced by promises or threats which deprive it of the character of a free and voluntary act is void. Machibroda v. United States, * * * 368 U.S. at 493 [82 S.Ct. at 510, 7 L.Ed.2d 473] (1962)." (432 F.2d at 814). However, as the court pointed out, a prosecutorial promise with respect to leniency does not necessarily deprive a plea of its volun-

tary character. "Rather," said the Second Circuit, "as the Supreme Court emphasized in Brady v. United States, 397 U.S. 742, 749 [90 S.Ct. 1463, 25 L.Ed.2d 747] (1970), a guilty plea is the product of many factors, and its voluntariness can be determined only by considering 'all of its relevant circumstances' . . . Thus, even if the alleged promise were proved, it would not necessarily entitle [movant] to relief." (432 F.2d at 814).

The plea of guilty with respect to the perjury count came only after the Government rested its case. Defendant was then in a position to assess the probability of a conviction on that count. The plea of guilty to the conspiracy charge was a plea to a superseding information containing only one count and carrying a maximum possible prison term of five years. The underlying indictment carried a possible prison sentence of 20 years on each of three counts. Thus, if defendant had been convicted on the underlying indictment (as his codefendant was on each of three counts), he would have faced a maximum prison term of 60 years. The perjury trial involved only the question whether defendant was known as Nickey Nelson, a name mentioned in connection with the grand jury's investigation into alleged illegal activity in the private garbage collection business in the metropolitan area. But the Government's witnesses in the perjury case included the owner of the Round-A-Bout Club, a waitress and bartender who worked at the club. Each testified he or she knew defendant as Nickey Nelson. Their testimony also involved some testimony necessary to the Hobbs Act indictment. Thus, after the trial of the Government's case on the perjury count, defendant was in a position to make some assessment with respect to the possibility of conviction on the underlying Hobbs Act conspiracy. Defendant was represented by and plead guilty after consulting with competent and expert lawyers of his own choosing.

As the voir dire of defendant upon each plea makes plain, defendant was

asked the following question to which he gave the following answer:

"Q. Has anyone, including your attorney or any of these United States Attorneys made any promises of leniency to you in order to get you to plead guilty?"

"A. No, Your Honor."

(Appendix A, p 7; Appendix B, p 8.)

When defendant filed his motion to reduce sentence in July 1970, he made no claim that his plea of guilty was induced by a promise that he would receive a sentence of only 18 months. Now, a year after his plea of guilty, defendant claims for the first time that his plea was induced by a promise of leniency.

The court, therefore, concludes from all of the relevant circumstances of this case that the pleas were voluntary. They were a "knowing, free and rational choice of the alternatives open to an accused." *Malcolm, supra,* 432 F.2d at 812. Defendant intelligently waived all of his constitutional rights.

The statute, 28 U.S.C. § 2255, requires "a prompt hearing" when the allegations of deprivation of constitutional rights raises disputed issues of fact. A hearing is mandated in order to " 'determine the issues and make findings of fact and conclusions of law' with respect to them." (Id. 812). Such a hearing is required "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." (Id. 812). The Second Circuit ruled in the *Malcolm* case, *supra,* that a hearing is not required "where the allegations are insufficient in law, undisputed, immaterial, vague, conclusionary, palpably false or patently frivolous." (Id. 812).

█ This court concludes that defendant's allegation that he was promised by his attorney, "confirmed" by the United States attorney, a sentence of not more than 18 months is palpably false. It should be noted again that defendant admits that no such promise was made to his attorney by the court. His affidavit is vague and conclusory. Defendant was pointedly asked at the time he offered to plead guilty whether he had been promised leniency by his own attorney or the Assistant United States Attorney. He replied without equivocation. All attorneys involved have filed an affidavit with this court affirming, without qualification, that defendant's statement is absolutely false. Defendant made no such claim until one year after his sentence and after he had secured a new attorney.

As the Second Circuit also ruled in the *Malcolm* case: "Deceit is a fragile foundation for relief on habeas corpus." (Id. 813). "Moreover", said the court, "discretion to deny relief where a claim is founded upon petitioner's own fraud upon the court is implicit in the statutory command that the district judge 'dispose of the matter as law and justice require.' 28 U.S.C. § 2243." (Id. 813). The *Malcolm* court reminded us that "habeas corpus has traditionally been regarded as governed by equitable principles. . . . Among them is the principal that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks." (Citation omitted) This claim, thus, presents yet another instance where a court must "guard against allowing a defendant to profit from his own wrong in this way." Illinois v. Allen, 397 U.S. 337, 345, 90 S.Ct. 1057, 1062, 25 L.Ed.2d 353 (1970)." (Id. 814).

Defendant's motion under 28 U.S.C. § 2255 is, therefore, denied without a hearing.

Submit order on 7 days' notice.

### APPENDIX A

March 12, 1970,

2 P.M.

THE CLERK: United States of America v. Nicola Melillo.

MR. SCHREIBER: The government is ready, your Honor.

MR. SCOPPETTA: Ready.

MR. SCHREIBER: Your Honor, the government proposes to proceed now by information. The defendant has waived the indictment before Judge Ryan, and

Judge Ryan has referred this matter to your Honor for pleading and for sentencing.

The information charges the defendant with a one-count information, it charges him with conspiracy to interfere with interstate commerce by threats and violence.

This information supersedes indictment 67 Crim. 208. I have already supplied defense counsel with a copy of this information. I understand the defendant has a motion at this time.

MR. SCOPPETTA: Well, our application, your Honor, is to withdraw the defendant's plea of not guilty and offers to plead guilty to information 70 Criminal—I don't have a number on my copy.

THE COURT: Has he previously pleaded to this information?

MR. SCOPPETTA: He has not, your Honor. He has not pleaded on the information. He is offering to plead guilty to the superseding information.

THE COURT: At this time?

MR. SCOPPETTA: Yes, your Honor.

THE COURT: All right.

THE CLERK: Nicola Melillo, the information numbered 70 Criminal 174, filed March 12, 1970, reads as follows:

The United States Attorney charges:

1. From on or about the 1st day of April, 1963, up to and including the filing of this information, in the Southern District of New York, Nicola Melillo, also known as Nickey Nelson, defendant, and James DeMasi and John Doe, a Caucasian male, approximately 35 years old, five feet nine, 180 pounds, dark hair and stocky built, named herein as coconspirators but not as defendants, did unlawfully, wilfully and knowingly combine and conspire to obstruct, delay and affect by extortion interstate commerce in violation of Section 1951, Title 18, United States Code.

2. It was further a part of said conspiracy that the defendant and his coconspirators would unlawfully, wilfully and knowingly delay, obstruct and affect interstate commerce, to wit, food, drink and other commodities to be received at the premises known as the Round–A–Bout Club, a restaurant and nightclub in New Rochelle, New York, by means of extortion and threats of physical violence to the persons and property at said premises.

In pursuance of said conspiracy and to further the objectives thereof, the following overt acts, among others, were committed in the Southern District of New York.

1. On or about the 14th day of May, 1963, the defendant, Nicola Melillo, also known as Nickey Nelson, was present at the Round–A–Bout Club, New Rochelle, New York, along with co-conspirator John Doe, as above identified.

2. On or about the 12th day of June, 1963, the defendant, Nicola Melillo, also known as Nickey Nelson, had a conversation at the Dream Lounge, Bronx, New York, with an individual by the name of Cha Cha Aiello.

3. On or about the 17th day of June, 1963, the defendant, Nicola Melillo, also known as Nickey Nelson, was present in an automobile on Main Street, at the corner of North Avenue, in New Rochelle, New York.

(Title 18, United States Code, Section 371.)

Mr. Melillo, how do you plead to this information?

DEFENDANT MELILLO: I plead guilty, your Honor.

(The Court interrogated the defendant as follows:)

Q   Mr. Melillo, how old are you?

A   51, I'll be 52, your Honor.

Q   How much education have you had?

A   Two terms in high school.

Q   Have you discussed this case with your attorney?

A   Yes, your Honor.

Q   Have you given him all of the facts?

A   Yes, your Honor.

Q Are you satisfied that your attorney has fully considered all the facts in your case?

A Yes, your Honor.

Q Have you discussed with your attorney any possible defenses which you might have to this information?

A I don't understand that question.

MR. SCOPPETTA: Have you discussed with me what defenses you could have had if it went to trial? Have we discussed those facts?

A Yes, your Honor.

Q Are you satisfied that your attorney has fully considered any defenses that you might have to this information?

A Yes, your Honor.

Q Did you under stand the charge which was just read to you by the clerk?

A Yes, your Honor.

Q Tell me in your own words what you understand you are charged with.

A I understand that I conspired with persons in a conspiracy in the Hobbs Act.

Q To violate the Hobbs Act?

DEFENDANT MELILLO: Is that it?

MR. SCOPPETTA: Well, yes, that is what the defendant said, your Honor. I am surprised—

Q Do you know what the Hobbs Act involves?

A No. I don't know what it involves.

MR. SCOPPETTA: Tell the Judge what you think.

A Your Honor, I conspired with others to affect the Round–A–Bout Club.

Q Do you understand that you are charged with conspiring with others to delay and obstruct interstate commerce and the movement of food and commodities in interstate commerce to be received at the Round–A–Bout Club by means of extortion and threats of physical violence to the persons and property at the Round–A–Bout Club? Do you understand that's what you are charged with?

A Yes, your Honor.

Q And that you are charged with doing at least one overt act named in this indictment in furtherance of that conspiracy?

MR. SCOPPETTA: You are charged with one of these, you did at least one of these (indicating).

A Yes, your Honor.

Q Do you understand that by pleading guilty to this information, the Court might sentence you to a term of imprisonment up to five years?

A Yes, your Honor.

Q And in addition may impose a fine up to $10,000?

A Yes, your Honor.

Q Do you feel that any of your constitutional rights have been violated in any way with your property, your arrest or these proceedings?

A No, your Honor.

Q Was any of your property seized?

A No, your Honor.

Q Are you pleading guilty because of any statement or confession you may have made to any police officer or the United States Attorney or any other law enforcement agent?

A No, your Honor.

Q Did you make any statement regarding this charge?

A No, your Honor.

MR. SCHREIBER: The government is aware of no incriminating statement with respect to this charge, your Honor. I would qualify that, after arrest.

Q You know of no statement you have made; is that right?

A No, your Honor.

Q Has anyone, including your attorney or the United States Attorney, made any promises of leniency to you—

A No, sir.

Q —in order to get you to plead guilty?

A No. I pleaded on my own, your Honor.

Q Has anyone threatened you or any members of your family to get you to plead guilty?

A No. I pleaded guilty on my own, your Honor.

Q Tell me now why you are pleading guilty. What did you do from on or about the 1st day of April, 1963, up to and including the filing of this information, which is today, in the Southern District of New York, together with James DeMasi and one John Doe?

A I conspired with others, your Honor.

Q To do what?

A To affect the articles in interstate commerce and the Round–A–Bout.

Q I can't hear you.

A To affect the articles in interstate in the Round–A–Bout.

Q How?

A By conspiring.

MR. SCOPPETTA: Judge, I think the defendant's position, as I understand it, basically, is although he did conspire with others, he committed no acts of violence himself nor did he direct anybody to commit acts of violence, so that is why he perhaps seems hesitant when we get to the how.

He is stating and he is admitting and pleading guilty to conspiring with others to affect articles in interstate commerce as they relate to the premises at the Round–A–Bout Club, but the defendant has always maintained, is maintaining now that he committed no acts of violence, nor did he direct anybody to commit acts of violence. But he is aware of—

THE COURT: You mean he did not conspire with others to obstruct the interstate commerce by means of extortion and threats of physical violence to persons and property at the Round–A–Bout Club?

MR. SCOPPETTA: Well, we have discussed this matter thoroughly, your Honor, and he is aware of the fact that he may be engaged in a conspiracy with others and not be aware of the details of what some other co-conspirator may have done, but it has been made clear to him that on the facts as we both know them that he is guilty of conspiracy, your Honor, and he is willing to state that—he is stating that, he is guilty of conspiracy, but he does not know all of the details or did he have firsthand knowledge of all of the conduct of any of these persons involved in the conspiracy.

But it has been made clear to him and as he discusses it with me, and we have gone through this very carefully, that he is guilty of taking part in this conspiracy.

THE COURT: Well, you know that the Court is not permitted to accept a plea of guilty unless there is some factual basis for it, and as I understand this man he doesn't know anything about any threats of violence or extortion.

MR. SCOPPETTA: Well, it may be, your Honor, he learned some of these things after the fact, although he was part of the conspiracy.

Q What did you do? What did you conspire to do?

A I conspired with Cha Cha Aiello at the Dream Lounge—

Q I can't hear you.

A I conspired with Cha Cha Aiello at the Dream Lounge. He wanted to gain an interest in the place and he told me about it and there was another fellow there. This is what I conspired with, your Honor.

Q You conspired with Cha Cha Aiello to get an interest in the Round–A–Bout Club?

A Yes. He was working there and he wanted an interest in the Round–A–Bout Club and we talked about it at the Dream Lounge that night.

Q And what did you talk about?

A About that he—how he can get it, your Honor.

Q How was he going to get the interest?

A Well, this I didn't know. I went up the place once, your Honor, that's all I went up there.

Q Well, that's not evidence of extortion or threats of violence. Talking

about getting an interest in a club is not a crime.

A   And I thought they might have intimidated people, your Honor.

Q   You thought what?

A   That they might have intimidated people.

MR. SCOPPETTA:  He is saying he is aware of the fact that any one of these co-conspirators may use intimidation in order to gain that interest.

Q   Did you agree with Aiello that you would help him get an interest in the Round–A–Bout Club through the use of force?

A   No, your Honor.  Intimidation.

MR. SCOPPETTA:  He is—

Q   By use of threatening people, is that it, physical violence?

MR. SCOPPETTA:  Threatening, not actually—

A   Not actually talking to them, not actually threatening them, your Honor.

MR. SCOPPETTA:  I think the difficulty here, your Honor, is that he is saying, as I understand it from all of our conversations, and as I say we have been through this carefully, is that he was aware that this man Aiello might engage in intimidation.  There was no specific direction nor did he ever participate in any actual violence, so that the intimidation or the threats of violence, your Honor, he did know about, and so—

Q   Did you agree with Aiello that the way the interest would be secured would be by threatening these people with physical violence?

A   Yes, your Honor.

Q   All right.  And on or about May 14, 1963, did you go to the Round–A–Bout Club?

MR. SCOPPETTA:  This is the first overt act.  Her Honor is referring to the first overt act.  Did you go to the Round–A–Bout Club?

DEFENDANT MELILLO:  I was there one day.

MR. SCOPPETTA:  Yes, that is May of 1963.

A   May of 1963, yes, your Honor.

Q   Did you have a conversation with Cha Cha Aiello on or about June 12, 1963, in the Dream Lounge?  Is that what you are talking about?

A   Yes, your Honor.  Yes, your Honor.

Q   That is what you referred to earlier, is that it?

A   Yes, your Honor.

Q   Then on or about the 17th of June, were you present in an automobile on Main Street in New Rochelle?

A   Yes, your Honor.

Q   Do you understand that by pleading guilty to this information you give up your right to be tried by 12 citizens from this district?

A   Yes, your Honor.

Q   And that before you could be found guilty, all 12 of those citizens would have to be convinced of your guilt beyond a reasonable doubt?

A   Yes, your Honor.

Q   And that throughout the trial the government would have the burden of proving your guilt of discharge beyond a reasonable doubt?

A   Yes, your Honor.

Q   That if you went to trial you would have the right to a speedy and public trial?

A   Yes, your Honor.

Q   That you would have the right to call witnesses in your own behalf?

A   Yes, your Honor.

Q   To examine the government's witnesses against you?

A   Yes, your Honor.

Q   And understanding all of these rights, you want to waive them and plead guilty, is that it?

A   Yes, your Honor.

Q   Are you under the influence of any drug or alcohol today?

A   No.  I'm just taking high blood pressure pills from the doctor.

Q Have you ever been the subject of any psychiatric care or treatment?

A No, your Honor.

Q Do you feel that you have understood everything which has transpired here today regarding this information?

A Yes, your Honor.

Q Is this your decision to plead guilty?

A Yes, your Honor.

Q Are you entering this plea freely and voluntarily and as a result of your own reasoning processes?

A Yes, your Honor.

Q Do you have any questions which you would like to ask your attorney or the Court at this time?

A No, your Honor.

THE COURT: All right. The Court accepts the plea of the defendant Nicola Melillo to information 70 Criminal 174. The date of sentence is April 15th, at 9:30. A pre-sentence report will be required.

MR. SCHREIBER: Thank you, your Honor. May the defendant be continued on bail as he is?

THE COURT: All right.

What is the bail?

MR. MALONEY: Your Honor bail is fixed on the matter which was disposed of yesterday and also in the earlier indictment for a total amount of $2,500.

THE COURT: All right. I think the room we will be in is 2804 in April.

MR. SCOPPETTA: Thank you, your Honor.

MR. SCHREIBER: Thank you, your Honor.

APPENDIX B.

March 11, 1970,

10:25 A.M.

(In open court)

THE COURT: All right. Is the defendant ready to proceed?

MR. SCOPPETTA: Your Honor, at this time the defendant has an applica-tion. He is moving to withdraw his plea of not guilty and offers to plead guilty to the single count of the information, one count of perjury.

THE COURT: All right. Mr. Clerk, do you want to read the indictment to him and ask him how he pleads.

THE CLERK: You are Mr. Nicola Melillo. You are charged in an indict-ment filed on November 20, 1966, indict-ment number 66 Criminal 382, dated April 20, 1966.

The grand jury charges:

1. On or about the 15th day of November, 1965, in the Southern District of New York, Nicola Melillo, also known as Nickey Nelson, the defendant, having duly taken an oath that he would testify truthfully before a competent tribunal in a case in which a law of the United States authorized an oath to be administered, to wit, a grand jury of the United States of America, duly impaneled and sworn by the United States District Court for the Southern District of New York and then and there inquiring for that district into violations of federal law, did unlawfully, wilfully and knowingly, and contrary to said oath, state material matters which he did not believe to be true as is more fully set forth hereinafter.

2. At the time and place aforesaid, the grand jury, inquiring as aforesaid, was conducting an investigation into, the possible violations of criminal statutes, including the Hobbs Antiracketeering Act. (Title 18, United States Code, Section 1951), false statements to agents of the federal government (Title 18, United States Code, Section 1001), and the conspiracy laws of the United States (Title 18, United States Code, Section 371), and pursuant to such investigation was inquiring into the defendant's role and participation in certain activities in the counties of Westchester, Bronx and Queens, New York.

3. It was material to said investigation that the grand jury determine whether the defendant in the conduct of his aforesaid activities was also known as,

was called, and used the name "Nickey Nelson."

4. At the time and place, the aforesaid Nicola Melillo, also known as Nickey Nelson, the defendant, duly appeared as a witness before the said grand jury and then and there being under oath testified falsely before the grand jury with respect to the aforesaid material matters as follows:

"Q Now, your name is Nicola Melillo?

"A Nicola Melillo.

"Q Are you also known as Nickey Nelson?

"A No.

"Q And you have never been known as Nickey Nelson?

"A No.

"Q Has anyone ever called you Nickey Nelson?

"A No."

5. The aforesaid testimony of Nicola Melillo, also known as Nickey Nelson, the defendant, as he then and there well knew and believed, was untrue in that he was, in fact, known and called Nickey Nelson. (Title 18, U.S.Code, § 1621.)

Mr. Melillo, how do you plead to the count that I have read to you, count 1 in this indictment?

DEFENDANT MELLILO: Guilty, sir.

THE COURT: I didn't hear you.

DEFENDANT MELILLO: Guilty, sir.

(The Court interrogated the defendant as follows:)

Q Mr. Melillo, how old are you?

A 51, I will be 52.

Q You are going to have to move up because I can't hear you. Move up here so I can hear you.

A 51.

Q 51?

A Yes ma'am.

Q How much education have you had?

A I went to the second grade in high school and then I left.

Q You finished your second year in high school?

A Not second year, two terms.

MR. SCOPPETTA: He says two terms of high school, your Honor.

Q Have you discussed this case with your attorney?

A Yes, I have.

Q Have you given him all the facts?

A Yes, I have.

Q Have you discussed with him any possible defenses that you might have to this indictment?

A I don't follow defenses.

MR. SCOPPETTA: The Judge is asking if you have discussed with me what possible defenses there would have been if we completed this trial. Did we discuss the case through?

DEFENDANT MELILLO: Yes, yes.

Q Are you satisfied that your attorney has fully considered your case?

A Yes.

Q Are you fully satisfied that he has competently advised you?

A Yes, your Honor.

Q Now, do you understand the charge which is made against you in the indictment?

A Yes, your Honor.

Q All right. Tell me in your own words what you understand that you have been charged with.

A I have been charged with using the name Nickey Nelson.

Q That is not what you are charged with. You are not charged with using the name Nickey Nelson.

A I am Nickey Nelson, your Honor.

MR. SCOPPETTA: The Judge is asking you—

Q Do you understand that you are charged with testifying falsely before a grand jury?

A Yes, your Honor.

Q You are sure you understand that?

A Yes, your Honor.

Q Do you understand by pleading guilty to this charge the Court might

sentence you to a term of imprisonment up to five years?

A Yes, your Honor.

Q And in addition may impose a fine of up to $2,000?

A Yes, your Honor.

Q Do you feel that any of your constitutional rights have been violated in any way in connection with your property, your arrest or these proceedings?

A No, your Honor.

Q Was any of your property seized when you were arrested?

A No, no, your Honor.

Q Are you pleading guilty because of any statement or confession you made to any police officer or any United States Attorney or any other law enforcement agent?

A No, your Honor.

Q Did you make any statement?

MR. SCOPPETTA: I don't think there is any—there was, of course, a conference with Mr. Meyer in the presence of his attorney that was testified to here. Mr. Meyer was the Assistant United States Attorney who questioned him in the grand jury and, of course, he made a statement to the grand jury in the presence of a U. S. Attorney.

THE COURT: No, I am talking about any statement. Did he make any statement, Mr. U. S. Attorney?

MR. SCHREIBER: No, your Honor, not that I know of, at least none that would be incriminating.

Q Has anyone, including your attorney or any of these United States Attorneys, made any promises of leniency to you in order to get you to plead guilty?

A No, your Honor.

Q Has anyone threatened you in any way to get you to plead guilty?

A No, your Honor.

Q All right. Why are you pleading guilty? What happened when you went before the grand jury?

A I was asked questions from the grand jury if I was Nickey Nelson, I says no, I was not Nickey Nelson. I lied to a grand jury, your Honor.

Q You were asked, "And you are also known as Nickey Nelson?"

A Yes, your Honor, I was asked that.

Q And you falsely replied no, is that it?

A Yes, your Honor.

Q You were asked, "And you were never known as Nickey Nelson?"

A Yes, your Honor.

Q And you falsely replied "No"?

A Yes, your Honor.

Q And you were asked, "And has anyone ever called you Nickey Nelson?"

A Yes, your Honor.

Q And you falsely replied "No"?

A Yes, your Honor.

Q And did you know at the time that you answered that way that those answers were false?

A Can I consult my lawyer?

MR. SCOPPETTA: The Judge is simply asking when you gave those answers in the grand jury, did you know that you were replying falsely?

DEFENDANT MELILLO: Yes.

MR. SCOPPETTA: State it.

A Yes, your Honor.

Q In other words, you knew you were lying to the grand jury, is that it?

A Yes, your Honor.

Q Now, do you understand by pleading guilty to this charge you give up the right to have this case go to the jury?

A Yes, your Honor.

Q And that before you could be found guilty, all those jurors would have to be convinced of your guilt beyond a reasonable doubt?

A Yes, your Honor.

Q Do you understand that even now the government has the burden of proving your guilt to the jury beyond a reasonable doubt?

A Yes, your Honor.

Q Do you understand that you are giving up your right to have witnesses testify in your own behalf?

A Yes, I do. Yes, your Honor.

Q And that you are giving up your right to cross-examine any further government witnesses that might be called?

A Yes, your Honor.

Q And understanding all of these rights, you want to waive them and plead guilty, is that it?

A Yes, your Honor.

Q Are you under the influence of any drug or alcohol at this time?

A No. I'm taking high blood pressure pills, your Honor.

Q Do you use any drugs?

A No, your Honor.

Q Or alcohol?

A No, your Honor.

Q Have you ever undergone any psychiatric care or treatment?

A No, your Honor.

Q Do you feel that you have understood everything which has happened here this morning regarding this plea of guilty?

A Yes, your Honor.

Q Now, is this your decision to plead guilty?

A Yes, your Honor.

Q Are you entering this plea freely and voluntarily and as a result of your own reasoning processes?

A Yes, your Honor.

Q Now, do you have any questions which you would like to ask your attorney or the Court at this time?

A No, your Honor.

THE COURT: All right. The Court accepts the plea of guilty to indictment 66 Criminal 382.

MR. MALONEY: Your Honor, the government's application, of course, would be for a pre-sentence report. I assume they are asking for approximately six weeks in the Probation Department.

THE COURT: All right. April 15th.

MR. SCHREIBER: Would that be in the morning, or in the afternoon?

THE COURT: 9:30.

MR. SCOPPETTA: May the defendant be continued in bail? I believe he is out—

MR. SCHREIBER: No objection, your Honor, to the bail being continued.

THE COURT: All right. If there is nothing further, we will bring in the jury and excuse them.

MR. SCOPPETTA: Are we free to go, your Honor?

THE COURT: Pardon me?

MR. SCOPPETTA: Are we excused?

THE COURT: Yes.

(The defendant and his counsel left the courtroom.)

(Jury present.)

THE COURT: Ladies and gentlemen, there has been a plea of guilty in this case to the indictment and, therefore, you are excused. You are to return to room 109.

(Jury excused)